

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00211-CV

_____

In the Interest of P.W., a Child

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-727120-22

Before Kerr, Birdwell, and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

Appellants J.W. (Father) and S. H.-D. (Mother) appeal the trial court's order terminating their parental rights to their daughter, P.W. (Penny).[1] In four issues, Father complains that the evidence is legally and factually insufficient to support the termination of his parental rights under Family Code Subsections 161.001(b)(1)(D), (E), and (O) and that the evidence is legally and factually insufficient to support the trial court's best-interest finding. In one issue, Mother complains that the evidence is legally and factually insufficient to support the trial court's best-interest finding. We will affirm.

### II. BACKGROUND

#### A. The Events Leading Up to Penny's Removal

When Penny was born in October 2022, Mother's urine tested positive for benzodiazepines, cocaine, and THC. Penny's urine tested positive for cocaine but negative for benzodiazepines and THC, and her meconium tested positive for cocaine, benzodiazepines, and marijuana. Penny was Mother's second child and Father's sixth.[2]

---

[1]We use aliases to refer to the child, her family members, and others connected to this case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]Father is not the father of Mother's older child, A.M. (Alicia). Alicia had been living with Mother's mother, S.L. (Grandmother), since 2022, and Mother's contact with Alicia had to be supervised.

Charmaine Jones, a Department of Family and Protective Services (Department) investigator, went to the hospital and interviewed Mother as well as Father, who was present in the hospital room. Mother stated that she had found out that she was pregnant in February 2022 and that she had been using cocaine and marijuana "off and on, two or three times a week" throughout her pregnancy. When asked about the benzodiazepines, Mother said, "[T]hat's probably from the Xanax." She admitted that she used drugs by snorting cocaine, smoking marijuana, and ingesting Xanax pills.

Father, who worked in health care, told the investigator that he suspected that Mother had been using drugs "based on how she move[d] and who she was hanging around with." Father claimed that he was attempting to get away from Mother due to the drug use but was "caught up" because of the new baby and trying to do the right thing. He said that at one time he and Mother were residing together, but due to her continued drug abuse, he had her move out, and she moved back in with Grandmother. Although Father had kicked Mother out of his home, he had later returned to a relationship with her and was aware of her drug use while she was carrying his child. Father agreed to submit to an oral swab drug screen, which came back negative. He also admitted that he was on parole for drug use and distribution.

Consistent with what Father had said, Mother stated that she and Alicia were residing with Grandmother. Mother also told the investigator that Grandmother had been the primary caretaker of Alicia for the past two years. The investigator held an

emergency family team meeting with Mother and her family members to identify an appropriate caretaker for Penny while Father's drug test results were pending.[3] Mother wanted Grandmother to be Penny's caretaker, but Grandmother was not an option due to a prior investigation that had resulted in a "Reason to Believe for Neglectful Supervision" finding against her regarding Alicia in 2021. Two aunts, M.S. and J.S.,[4] agreed to complete a safety plan for Penny to reside with them while the investigation continued. Penny was discharged from the hospital three days after being born.

By November 2022, Mother and Father were residing together again. After Father's nail bed test results showed that he was negative for drugs, he was given the opportunity to care for Penny, but he refused because he would have to make Mother move out. Mother agreed to participate in a drug court program. The program provided an option for stable housing, but according to Father, Mother was not the "type to live in a group setting with other adults [because] she is aggressive and has a disrespectful attitude." At that time, both Mother and Father said that they wanted

---

[3]Although Father's oral swab drug screen had returned negative, he was asked to submit to additional drug screen testing due to his admission of drug usage and criminal history involving illegal drugs. He took a nail bed test, which also came back negative.

[4]It is unclear from the record whether these were Grandmother's aunts (and therefore Mother's great aunts), Grandmother's sisters (and therefore Mother's aunts), or a sister of Mother and a sister of Grandmother. We will refer to them simply as the Aunts or by their initials.

Penny to stay with Grandmother, despite the Department's telling them that she was not an option. By December 2022, Mother and the Aunts were in a verbal disagreement about Penny's care. Mother considered J.S. as her only option to prevent Penny from going into foster care, but Mother was upset that J.S. had been giving Penny medicine that was not prescribed for the child. J.S. said that she did not want to be Penny's primary caretaker any longer and requested that the placement end.

Father expressed a concern that J.S. could harm Penny "due to the discord" with Mother. Father and Mother tried to convince the investigator that Penny would be better off in Grandmother's care and claimed that they were going to "move" her. The investigator asked Father if he had any relatives who could care for Penny, but Father stated that he had no one and would not give the investigator any names of family members she could approach about caring for Penny. When the investigator told Mother and Father that it could come to a point where Penny had no safe place to go except into foster care, Father said that he thought that "foster care would probably be the best place" for Penny at that point.

On December 12, 2022, the Department filed its "Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent–Child Relationship." That same day, the trial court signed an ex parte order naming the Department as Penny's temporary sole managing conservator.

## B. The Events Between Penny's Removal and the Trial

Penny went into foster care.[5] Jennifer Crosson, a permanency specialist or caseworker for Our Community Our Kids (OCOK),[6] developed a service plan to address the concerns that she had identified with Mother and Father. The plan, which was made an order of the trial court, required Mother and Father to "maintain a sober lifestyle for at least six months"; to "make responsible decisions to ensure [Penny] is safe"; to "provide proper supervision, food, clothing, and any other necessities for [Penny]"; to "be cooperative and . . . actively participate in all court ordered services"; and to "follow all service provider recommendations."

In April 2023, Penny was placed in the home of R.B. and A.B. Father had known R.B. for decades and suggested his home as a possible placement for Penny.

Father and Mother both completed counseling, parenting classes, and substance abuse assessments and attended drug treatment for their substance abuse as required by their service plan, but they both continued to test positive for illegal drugs multiple times even after completing the drug treatment. They also continued to live together. In December 2023, the Department amended its Petition, asking the trial

---

[5]The record contains very little information about Penny's foster home, but it appears that she was no longer in foster care after April 2023. No one from the foster family testified at trial.

[6]Crosson testified that OCOK was the Department's agent for purposes of providing services to children and their parents when the children are in the conservatorship of the Department. *See In re S.G.*, No. 02-24-00045-CV, 2024 WL 1792764, at *3 n.5 (Tex. App.—Fort Worth Apr. 25, 2024, pet. denied) (mem. op.).

court to terminate both Father's and Mother's parental rights to Penny "[i]f reunification . . . cannot be achieved."

## C. Trial

The case proceeded to final trial in April 2024. Father and Mother both testified at the trial, as did Crosson, A.B., and Jones.[7] Mother referred to Father as her "husband"; Father called Mother his "girlfriend for 6 to 8 years."[8] Drug test results admitted at trial revealed the following:

- In February 2023, Mother's hair tested positive for cocaine and marijuana.

- In March 2023 and April 2023, Mother's urine tested negative for everything. Father's hair tested positive for cocaine.

- In May 2023, Mother's hair tested positive for cocaine, methamphetamine, and the opiate hydrocodone, and her urine tested positive for hydrocodone but negative for all other substances.

- In June 2023, Mother's hair tested positive for hydrocodone, norhydrocodone, cocaine, amphetamine, and methamphetamine.

- In July 2023, Father's hair tested positive for methamphetamine and cocaine but negative for all other substances.

---

[7]The only other witness who testified at trial was one of Father's home health clients. His testimony was very brief and limited to telling what Father did for him and clearing up a misunderstanding about an incident involving a bottle of his medication. The Department had questioned Father about his having a client's medication, a muscle relaxer, in his home. Father testified that his client had left the medication in Father's car. Father brought it into his apartment and returned it to the client as soon as he had the opportunity. The client corroborated this testimony.

[8]Later on in the trial, when testifying about their assets, Father called Mother his "wife" and said, "Whatever I've got is hers."

- In August 2023, Mother refused a urine test.[9]

- In September 2023, Mother's hair tested positive for cocaine but negative for other substances. However, later that same month, her hair tested positive for hydrocodone.

- Also in September 2023, Father's nails tested positive for methamphetamine and cocaine. His hair tested positive for cocaine but negative for other substances, including any amphetamines.

- In November 2023, Mother's hair tested positive for hydrocodone and cocaine but negative for other substances, and Father's nails tested positive for cocaine and methamphetamine but negative for other substances.

- In February 2024, Mother's hair tested positive for hydrocodone and cocaine, and Father's nails tested positive for cocaine and methamphetamine but negative for other substances.

- In March 2024, Mother's nails tested positive for cocaine and negative for other substances, but her hair and urine—and Father's hair and urine—tested negative for everything.

Mother testified at trial that she was "clean." She admitted that she had used cocaine several times a week during her pregnancy with Penny but claimed that she had last used cocaine in December 2022. She equivocated on how long it had been since she had taken hydrocodone. She testified that a doctor had prescribed her hydrocodone for pain when she had Penny and that she had taken ten pills sporadically in 2023. She testified that she had tested positive for hydrocodone in

---

[9] *See In re S.V.*, No. 02-23-00188-CV, 2023 WL 5967890, at *8 (Tex. App.—Fort Worth Sept. 14, 2023, no pet.) (mem. op.) ("A rational factfinder could have reasonably concluded that [the parent]'s refusal to take drug tests reinforced the conclusion that [the parent] was using drugs and was trying to avoid detection.").

8

May 2023 because she "was taking them," but she had "no idea" why she was still testing positive for hydrocodone in September 2023. However, she later said that it had been at least a year since she had taken a hydrocodone pill. She acknowledged her positive drug test results but insisted that she had "never used" methamphetamine; in her words, "The only thing I had [a] problem doing was popping pills and cocaine. That's it." She also testified that Father had "never used ever." Father likewise acknowledged his positive drug test results but testified that he had never used cocaine or methamphetamine.

Both Mother and Father admitted to past marijuana use. Mother testified that she was a "heavy user"; Father testified that it had been "[y]ears" since the last time he had used. Crosson testified that Mother had never told her that she was taking hydrocodone for pain from her delivery of Penny; according to Crosson, Mother had said that she would take the pills for tooth pain. Crosson further testified that Mother "seemed shocked" and "denied using" when shown her positive drug test results and that Father had never acknowledged that he had used drugs during this case. A.B. testified to a conversation she had overheard in which Mother had said, "I don't know why [Father]'s test came back positive because it was negative at the beginning of the case and then all of a sudden it started testing positive. . . . I don't know why this is happening because [Father]'s never done drugs." According to A.B., Father then said to her, "[N]o, it was negative at that time and I went on a run and now it's testing positive." A.B. elaborated that she did not know exactly what "I went on a

9

run" meant, but she remembered "thinking it's so refreshing that he's just being honest about it, you know, like . . . it was good just to talk about it."

Judgments for Father's convictions of the following offenses were also admitted at trial without objection:

| Offense Date | Offense | Date of Conviction |
|---|---|---|
| March 3, 1999 | Evading arrest or detention | January 18, 2000 |
| November 21, 1999 | Possession of under 2 ounces of marijuana | January 18, 2000 |
| November 15, 2005 | Evading arrest or detention | February 9, 2006 |
| May 28, 2002 | Possession with intent to deliver 4 grams or more but less than 200 grams of cocaine | July 27, 2007 |
| June 30, 2009 | Possession of 4 grams or more but less than 200 grams of cocaine | May 20, 2010 |
| January 26, 2016 | Possession of less than 1 gram of heroin | December 4, 2017 |
| November 17, 2018 | Possession of under 2 ounces of marijuana | March 20, 2019 |

Father received a 20-year sentence for his 2010 possession conviction. Father testified that he had served four or five years in prison and had been on parole since that time. He acknowledged his past as a drug dealer. Mother testified that she was aware of Father's history as a drug dealer but that "he's not like that anymore. He's a totally different person."

Father testified that he worked with Eagle Home Health assisting patients. He testified that he worked twenty-one hours a week and was down to one client. He had worked there since November 2023. At the time Penny was removed in December 2022, he "was doing odd jobs and selling . . . T-shirts." He estimated that

10

he was averaging "[r]oughly [$]1200" in monthly income from his home health care job at the time of trial and an additional $300 or $400 a month from his T-shirt sales since January 2023. He testified that "going forward" he had "a new and up-and-coming job" and that "in the near future" he would be employed with Papa John's. He testified that he had "[$]2- or $3,000" in his savings account.

Mother claimed that she did not know how much Father made each month and that she did not ask him. She also testified that from December 2022 through August 2023, she had been employed "off and on . . . doing temporary jobs" and that she was not working from August 2023 until January 2024, during which time she had received $900 a week in unemployment. She then started a warehouse job for $17 an hour that lasted for "probably like a month and a half because the project was finished and the project was over; there was[] no more work." Additionally, she testified that she had been doing home health care work since she was seventeen but that the "last time [she had done] it was around" August 2023.[10] She also claimed that she had not been employed for months at the time of trial but that she had "just had an interview" the day before the trial and was going to start at Leticia & Company in Benbrook the day after the trial. She testified that she had "like [$]6-, 7,000" in her savings account and that her total income for 2023 "was like [$]15,000."

---

[10]Mother was born in March 1996 and would have been twenty-seven in August 2023.

11

Mother and Father agreed on what their household expenses were. Mother testified that their monthly rent was $1,155 including water; that their electric bill was "between [$]100 and $200"; that she had a car payment of $350; and that she paid "[l]ike [$]120" a month for insurance on the car. When asked who was paying all their household expenses, she testified:

> I do. My husband, he do whatever to make sure the household is taken care of, but I also have a support system which is my dad, my stepdad and my mother and they also help me too with my situation until I start a job.
>
> . . . .
>
> . . . . Basically I have a good support system; not want for nothing. Been spoiled since I was little. Good house; been taken care of. My kid is good. [Penny] also will be good with me. I'm a good mother.

Crosson testified that it was "concerning" to her how much money was coming into Mother's and Father's household given their expenses because, based on the check stubs that Father was providing her, "it's barely enough to cover the rent."[11] She stated that she had "asked where the extra money is coming from," and Mother had told her "that they're just really good with budgeting their money." In contrast, Crosson testified that R.B. and A.B.'s income and expenses lined up and that they were able to show that they could afford their lifestyle. She said that she did not think

---

[11]Crosson recalled that Father had last provided pay stubs the week before trial, and they were each for $504 for a total of $1,008 that month.

12

that Mother and Father could actually meet Penny's needs and that R.B. and A.B. were willing and able to adopt her.

Crosson testified that Penny was bonded to R.B. and A.B. and that she had a good bond with their three children as well. Ultimately, Crosson asked that both Mother's and Father's parental rights be terminated and averred that termination was in Penny's best interest. Crosson also said that it concerned her that Father knew that Mother was using drugs while she was pregnant and did not seem to take any action in that regard. She also had concerns about Mother's ability to be a safe parent for Penny due to her "[c]ontinuing to test positive throughout this case up until March of this year and then denying the usage." Crosson testified that she had not seen "real[,] significant change" in Mother from the beginning of the case until trial.

Crosson further stated that her "major concern" with Father was his "testing positive on the hair tests and the nail tests and just denying the usage," but she was also concerned about "how they're able to sustain the life that they have financially." For her part, Mother offered—and the trial court admitted—photographs of the apartment that she shared with Father showing that the home was clean, organized, well-stocked with food, and ready for Penny's return. A.B. testified that, since Penny had come to live with her family, Father and Mother had been visiting her at R.B. and A.B.'s house "on usually Sunday afternoons" for two hours at a time and that "[f]or the most part," those visits "go pretty well."

After the trial concluded, the trial court terminated both Mother's and Father's respective parent–child relationships with Penny. The trial court found by clear and convincing evidence that termination was in Penny's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). The trial court further found by clear and convincing evidence that Mother had

> . . . knowingly placed or knowingly allowed [Penny] to remain in conditions or surroundings which endanger[ed her] physical or emotional well-being . . . , pursuant to § 161.001(b)(1)(D), Texas Family Code;

> . . . engaged in conduct or knowingly placed [Penny] with persons who engaged in conduct which endanger[ed her] physical or emotional well-being . . . , pursuant to § 161.001(b)(1)(E), Texas Family Code;

> . . . failed to comply with the provisions of a court order that specifically established the actions necessary for [M]other to obtain the return of [Penny,] who ha[d] been in the permanent or temporary managing conservatorship of the Department . . . for not less than nine months as a result of [her] removal from the parent under Chapter 262 for . . . abuse or neglect . . ., pursuant to § 161.001(b)(1)(O), Texas Family Code;

> . . . been the cause of [Penny] being born addicted to alcohol or a controlled substance, other than a controlled substance legally obtained by prescription, as defined by § 161.001(a)(1) and § 161.001(a)(2), pursuant to § 161.001(b)(1)(R), Texas Family Code;

> . . . used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of [Penny], and (1) failed to complete a court-ordered substance abuse treatment program; or (2) after completion of a court-ordered substance abuse treatment program continued to abuse a controlled substance, pursuant to § 161.001(b)(1)(P), Texas Family Code[.]

> The trial court further found by clear and convincing evidence that Father had

14

. . . knowingly placed or knowingly allowed [Penny] to remain in conditions or surroundings which endanger[ed her] physical or emotional well-being . . . , pursuant to § 161.00l(b)(1)(D), Texas Family Code;

. . . engaged in conduct or knowingly placed [Penny] with persons who engaged in conduct which endanger[ed her] physical or emotional well-being . . . pursuant to § 161.001(b)(1)(E), Texas Family Code;

. . . failed to comply with the provisions of a court order that specifically established the actions necessary for [F]ather to obtain the return of [Penny,] who ha[d] been in the permanent or temporary managing conservatorship of the Department . . . for not less than nine months as a result of [her] removal from the parent under Chapter 262 for . . . abuse or neglect . . . pursuant to § 161.001(b)(1)(O), Texas Family Code.

*See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (P), (R). Mother and Father appeal from that termination order.

## III.  DISCUSSION

Father's four issues and Mother's single issue all challenge the sufficiency of the evidence to support the trial court's findings. Both parents challenge the trial court's finding that terminating their parental rights was in Penny's best interest, but because Father also challenges the sufficiency of the evidence supporting the conduct-related grounds for terminating his parental rights, we will review the evidentiary sufficiency of the trial court's conduct-related findings as to Father first and then review the trial court's best-interest findings.

## A.  Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence:  (1) that the

15

parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

In evaluating whether evidence is factually sufficient under the clear and convincing standard, we determine whether, on the entire record, a factfinder could

16

reasonably form a firm conviction or belief that the challenged finding is true. *H.R.M.*, 209 S.W.3d at 108. If the factfinder could reasonably do so, then the evidence is factually sufficient. *In re C.H.*, 89 S.W.3d 17, 18–19 (Tex. 2002). But if not—because the disputed evidence that could not reasonably support the finding is too significant—then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved one or more of the conduct-specific grounds on which the termination was based and that the termination of the parent–child relationship would be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *C.H.*, 89 S.W.3d at 28.

## B. Conduct Grounds

In his first three issues, Father argues that the evidence is legally and factually insufficient to support termination of his parental rights under Family Code Subsections 161.001(b)(1)(D), (E), and (O).[12]

### 1. Applicable Law

Subsections (D) and (E) provide that the trial court may order the termination of a parent's rights if it finds by clear and convincing evidence that the parent has

    (D)    knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [or]

    (E)    engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

"Endanger" means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under Subsection (D), it is necessary to examine the evidence related to the environment of the child to determine if the environment was the source of the endangerment to the child's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. The conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a

---

[12]In contrast to Father, Mother does not challenge the trial court's conduct-ground findings.

child. *Id.* For example, illegal drug use by the parent and drug-related criminal activity by the parent "support[] the conclusion that the child[]'s surroundings endanger [her] physical or emotional well-being." *Id.* Given the nature of environment-based endangerment, it logically follows that the relevant timeframe for an environment-based endangerment finding under Subsection (D) is prior to the child's removal. *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *9 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.). We have recently said that evidence of the following can support the conclusion that a child's surroundings endanger her physical or emotional well-being for purposes of Subsection (D):

> a parent's drug use, a parent's allowing a child to be around another person—including another parent—who is using drugs or participating in unlawful conduct, a parent's knowledge of the other parent's drug use during pregnancy and corresponding failure to attempt to protect the unborn child from the effects of that drug use, a parent's imprisonment or intentional activity that exposes the parent to potential incarceration, or a parent's mental instability or untreated mental illness.

*In re S.D.*, No. 02-24-00099-CV, 2024 WL 3365240, at *2 (Tex. App.—Fort Worth July 11, 2024, no pet. h.) (mem. op.) (footnotes and citations omitted).

Under Subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See id.*; *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Termination under Subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125. It is not necessary, however, that

19

the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to a child's well-being may be inferred from parental misconduct standing alone. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *Id.* Criminal activity that exposes the parent to incarceration may also endanger a child. *In re I.L.*, No. 02-18-00206-CV, 2018 WL 5668813, at *5 (Tex. App.—Fort Worth Nov. 1, 2018, no pet.) (mem. op.); *In re A.N.D.*, No. 02-12-00394-CV, 2013 WL 362753, at *2 (Tex. App.—Fort Worth Jan. 31, 2013, no pet.) (mem. op.).

Endangering conduct is not limited to actions directed towards the child. *Boyd*, 727 S.W.2d at 533. We may consider conduct that occurred outside the child's presence in our review. *In re A.P.*, No. 02-22-00180-CV, 2022 WL 16646478, at *8 (Tex. App.—Fort Worth Nov. 3, 2022, no pet.) (mem. op.); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). It necessarily follows that the endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage. *J.O.A.*, 283 S.W.3d at 345. "Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct." *R.W.*, 129 S.W.3d at 739.

20

## 2. Analysis

Because the evidence pertaining to Subsections (D) and (E) is interrelated, we conduct a consolidated review of the findings under those subsections. *See In re S.H.*, No. 02-17-00188-CV, 2017 WL 4542859, at *10 (Tex. App.—Fort Worth Oct. 12, 2017, no pet.) (mem. op.); *In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.).

Here, the record reflects that Father had a history of illegal drug activity—including a past as a drug dealer—and was still on parole at the time of trial. He had multiple prior convictions for possession of a controlled substance, including convictions for possessing marijuana, heroin, and cocaine.[13] He tested positive for cocaine and methamphetamine during the pendency of the termination suit—after Penny's removal—although he denied using either. A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being.[14]    *In re M.E.-M.N.*,

---

[13]In his brief, Father touts that he "readily admitted" at trial that "his criminal past lasted from 1999 to 2019" and that Penny was not born until 2022. "Evidence of a recent improvement does not absolve a parent of a history of irresponsible choices." *In re M.S.*, No. 02-21-00007-CV, 2021 WL 2654143, at *17 (Tex. App.—Fort Worth June 28, 2021, pet. denied) (mem. op. on reh'g) (quoting *In re A.M.*, 385 S.W.3d 74, 83 (Tex. App.—Waco 2012, pet. denied)). Further, Father's drug test results evinced that he was still using illegal drugs as late as February 2024.

[14]Father contends that (1) "there was no expert testimony as to what those" drug test results "really mean or demonstrate, so basically they are numbers on a piece

342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied). The trial court, as factfinder, could have believed that Father had been using cocaine and methamphetamine based on the drug test results and disbelieved Father's self-serving testimony to the contrary. *See J.O.A.*, 283 S.W.3d at 346; *see also In re A.J.A.R.*, No. 14-20-00084-CV, 2020 WL 4260343, at *4 (Tex. App.—Houston [14th Dist.] July 24, 2020, pet. denied) (mem. op.) ("The trial court, as the sole judge of the credibility of the witnesses, was free to disregard Father's self-serving testimony that he had not used cocaine or other drugs since this case started.").

Father also persisted in carrying on a long-term relationship with Mother, both before and after Penny's removal. A parent's choice to continue relationships with people who abuse illegal drugs may constitute evidence of endangerment. *In re B.U.*, No. 02-23-00150-CV, 2023 WL 5967604, at *4 (Tex. App.—Fort Worth Sept. 14, 2023, pet. denied) (mem. op.) Although there was some evidence of lapses in their relationship, Mother had been living with Father for a year at the time of trial. *See In*

---

of paper that relate to a subject beyond lay understanding, so the trial court could not have considered them as evidence" because "the proponent of the evidence did not show that Cross[o]n was qualified to testify as to the interpretation of his positive drug tests" under Texas Rule of Evidence 702 and (2) neither the Department nor the ad litem proved the facts contained within the drug test results to the trial court by expert testimony. *See* Tex. R. Evid. 702. Father did not object to Crosson's testimony on this ground, and we have previously rejected the argument that the lack of expert testimony regarding the significance of drug test results prevents the trier of fact from considering the results as evidence of endangerment. *In re C.W.*, No. 02-14-00274-CV, 2014 WL 7139645, at *5 (Tex. App.—Fort Worth Dec. 12, 2014, no pet.) (mem. op.). Father offers us no reason to abandon our binding precedent on this issue.

*re K.W.*, No. 09-19-00442-CV, 2020 WL 1755985, at *8 (Tex. App.—Beaumont Apr. 9, 2020, pet. denied) (mem. op.) (considering mother's continued relationships with relatives who had tested positive for illegal drugs or were known to use illegal drugs as evidence of endangerment). When given the opportunity to take possession of Penny, he refused because he would have had to have Mother move out. Both Father and Mother agreed with the Department that their drug use endangered Penny.

The trial court also heard testimony of Mother's "aggression" and "hostile, angry, just up-and-down emotions that seemed to be erratic." *See In re S.L.L.*, No. 13-19-00442-CV, 2020 WL 103862, at *6 (Tex. App.—Corpus Christi–Edinburg Jan. 9, 2020, no pet.) (mem. op.) (noting that a parent's willingness to tolerate and excuse erratic behavior from a romantic partner at the expense of a child's physical and emotional well-being may be considered in endangerment analysis); *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g) ("Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the 'conditions or surroundings' of the child's home under [Subsection (D)]."). And Father knew that Mother had used drugs while she was pregnant with Penny. A parent's knowledge of the other parent's drug use during pregnancy and corresponding failure to attempt to protect the unborn child from the effects of that

23

drug use can contribute to an endangering environment and thus support an endangerment finding. *See In re J.W.*, 645 S.W.3d 726, 749–50 (Tex. 2022).[15]

### 3. Holdings

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we hold that a reasonable factfinder could have formed a firm belief or conviction that Father had knowingly placed or had knowingly allowed Penny to remain in conditions or surroundings that endangered her emotional or physical well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D). Likewise, we hold that a reasonable factfinder could have formed a firm belief or conviction that Father had engaged in conduct that endangered Penny's physical or emotional well-being. *See id.* § 161.001(b)(1)(E).

Giving due deference to the factfinder's endangering-environment and endangering-conduct findings, without supplanting the factfinder's judgment with our

---

[15]In *J.W.*, a majority of the supreme court ultimately concluded that "the evidence relating to Subsection (D) was straightforward and conclusively insufficient to justify termination on that ground," recognizing that the appellant father had "made what can only be described as a concerted effort to help [the m]other address her addiction under the circumstances." 645 S.W.3d at 750. That is not the case here. Mother testified that when she was using cocaine while pregnant with Penny, "[n]obody didn't have control of [her]." Crosson expressed concern that Father knew that Mother was using drugs while she was pregnant and did not seem to take any action in that regard. As one of our sister courts has observed, "A child is endangered when the environment or the parent's course of conduct creates a potential for danger which the parent is aware of but disregards." *In re B.C.S.*, No. 04-21-00544-CV, 2022 WL 2056365, at *5 (Tex. App.—San Antonio June 8, 2022, pet. denied) (mem. op.) (quoting *In re R.S.-T.*, 522 S.W.3d 92, 110 (Tex. App.—San Antonio 2017, no pet.)).

own, and after reviewing the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that Father had knowingly placed or had knowingly allowed Penny to remain in conditions or surroundings that endangered her emotional or physical well-being and that Father had engaged in conduct that endangered her physical or emotional well-being. *See id.* § 161.001(b)(1)(D), (E). We thus overrule Father's first and second issues.

Because we hold that the evidence is legally and factually sufficient to support the endangerment findings under Section 161.001(b)(1)(D) and (E), and because only one conduct-ground finding is necessary to sustain a parental-rights termination, we need not address Father's challenge to the trial court's finding under Section 161.001(b)(1)(O). *See* Tex. Fam. Code Ann. § 161.001(b)(1); *E.N.C.*, 384 S.W.3d at 803; *J.L.*, 163 S.W.3d at 84; *see also* Tex. R. App. P. 47.1. We therefore do not address Father's third issue.

## C. Best Interest

In his fourth issue and in her first issue, Father and Mother each argue that the evidence is legally and factually insufficient to support the trial court's respective best-interest findings. We disagree.

### 1. Standard of Review and Applicable Law

We review the parties' respective challenges to the sufficiency of the trial court's best-interest findings under the same review standards stated above regarding the conduct grounds. *In re T.D.*, No. 02-22-00215-CV, 2022 WL 11483054, at *9

25

(Tex. App.—Fort Worth Oct. 20, 2022, pet. denied) (mem. op.). Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Evidence that is probative of the conduct grounds under Section 161.001(b)(1) may also be probative of best interest under Section 161.001(b)(2). *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28. We also consider the evidence in light of the following nonexclusive factors that the factfinder may apply in determining the child's best interest:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one; and

- the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249; *E.N.C.*, 384 S.W.3d at 807. These factors do not form an exhaustive list, and some

26

factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*

### 2. Analysis

#### a. Penny's Desires

Penny, eighteen months old at the time of trial, was too young to communicate her desires; "thus, this factor is considered to be neutral, weighing neither for nor against the trial court's best-interest finding." *See In re C.W.*, No. 02-23-00414-CV, 2024 WL 637264, at *9 (Tex. App.—Fort Worth Feb. 15, 2024, pet. denied) (mem. op.). No probative evidence of Penny's desires was presented at trial.

#### b. Penny's Emotional and Physical Needs

The evidence at trial showed that Penny does not have any emotional or behavioral health needs or other special needs. But we have said that "children need permanency and stability." *In re G.V., III*, 543 S.W.3d 342, 350 (Tex. App.—Fort Worth 2017, pet. denied). And we have stressed that a child needs "a stable home and engaged parents" who do not use drugs. *In re G.M.*, No. 02-23-00061-CV, 2023 WL 4243349, at *8 (Tex. App.—Fort Worth June 29, 2023, pet. denied) (mem. op.) (quoting *In re M.J.*, No. 02-23-00026-CV, 2023 WL 3643673, at *11 (Tex. App.—Fort Worth May 25, 2023, no pet.) (mem. op.)). Further, the trial court could have inferred that Father's and Mother's drug problems were going to continue and that,

27

because Father and Mother had a continuing pattern of drug abuse, they did not have the ability to meet Penny's current and future physical and emotional needs. *See G.M.*, 2023 WL 4243349, at *8; *A.P.*, 2022 WL 16646478, at *10. This factor weighs in favor of termination.

### c. Emotional and Physical Danger to Penny

Mother's and Father's continued drug abuse could endanger Penny physically and emotionally were she returned to their custody. *See, e.g., In re D.S.*, 176 S.W.3d 873, 879 (Tex. App.—Fort Worth 2005, no pet.) ("Evidence of a parent's long-term drug use and unstable lifestyle can support a factfinder's conclusion that termination is in the child's best interest."); *see also C.H.*, 89 S.W.3d at 26 (unchallenged endangerment findings can support best-interest finding). Crosson testified to this fact, and she also testified that Mother's conduct specifically had endangered Penny and that she had put Penny in an endangering environment. And Father even testified that it would be dangerous for Penny "if her mother was using or [he] was using" and that "[i]t would or it could" also put an emotional toll on a young child like Penny. By contrast, Crosson described R.B. and A.B.'s household as a loving home and testified that they were able not only to financially provide for Penny but also to "provide a very safe -- safe home for" her. There is no evidence in the record that R.B. and A.B.'s home posed any threat of emotional or physical danger to Penny. *See G.M.*, 2023 WL 4243349, at *8. This factor supports termination.

28

### d. Parental Abilities of the Individuals Seeking Custody

Penny's "young age places a premium on parental abilities and the stability of h[er] home to address issues related to Mother's [and Father's] drug addiction." *See In re K.W.*, No. 02-24-00082-CV, 2024 WL 3461749, at *6 (Tex. App.—Fort Worth July 18, 2024, no pet. h.) (mem. op.). Crosson testified that R.B. and A.B. had been meeting Penny's medical, physical, emotional, financial, and developmental needs and that she anticipated that they would be able to continue to meet those needs in the future. They were willing and able to adopt Penny. Crosson also testified that the couple's income and expenses lined up; they were able to show their income and their expenses and that they could afford their lifestyle. Father and Mother, on the other hand, were not able to demonstrate how they paid for all their expenses, and Crosson testified that she did not think that they could actually meet Penny's needs. Although Father testified that he was totally capable of taking care of Penny, the trial court was entitled to consider the evidence of his and Mother's continued drug use, their long-term relationship and living situation, and Crosson's concern that their drug use and denial of it rendered them unable to safely parent Penny. *See In re J.R.*, No. 14-01-01042-CV, 2002 WL 31318790, at *12 (Tex. App.—Houston [14th Dist.] Oct. 17, 2002, no pet.) (not designated for publication) (affirming termination as in child's best interest where caseworker maintained that termination was appropriate even though mother was drug and alcohol free at time of trial "because she had been untruthful

29

about her drug use in the past and had a long history of relapses"). This factor favors termination.

### e. Programs Available to Promote Penny's Best Interest

Although Father and Mother both completed their counseling, parenting classes, and substance abuse assessments as required by the service plan and attended outpatient treatment for their substance abuse, they both tested positive for illegal drugs multiple times during the pendency of this termination suit. *See In re P.P.-S.*, No. 02-23-00309-CV, 2024 WL 123654, at *8 (Tex. App.—Fort Worth Jan. 11, 2024, no pet.) (mem. op.) ("While Mother completed some of her services, she did not accomplish the intended goal of those services."). Additionally, Mother had declined an opportunity to participate in a drug court program that was made available to her. "The factfinder can infer from a parent's failure to take the initiative to utilize programs offered by the Department that the parent did not have the ability to be motivated to seek out available resources needed now or in the future." *In re S.B.*, 597 S.W.3d 571, 587 (Tex. App.—Amarillo 2020, pet. denied). Crosson testified that Mother had not shown her that she had changed as far as her drug use and that, because of both parents' positive drug test results and their steadfast denials of their drug use, neither parent had successfully completed the service plan.[16] *See In re A.C.*,

---

[16]This testimony belies Mother's contention that she had "completed her service plan." Even if Mother had completed the service plan, we would still reject her argument that, because she completed her service plan, "the evidence was legally insufficient to find termination is in the child's best interest." A parent's failure to

30

394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (explaining that fifth *Holley* factor weighed against mother who completed parts of Department's family services plan but continued to use drugs and never completed entire program).

There was little evidence of the programs available to assist R.B. and A.B. to promote Penny's best interest; A.B. testified that she had not received any assistance during this case. However, the caseworker testified that Penny does not have any special needs and that R.B. and A.B. had been meeting Penny's medical, physical, emotional, financial, and developmental needs. And A.B. testified that she and her husband were fine with adopting with no expectation of assistance at all and that she was confident that they can meet those needs if something should later arise. On balance, this factor weighs slightly in favor of termination. *See In re B.K.G.D.*, No. 01-20-00057-CV, 2020 WL 3821086, at *13 (Tex. App.—Houston [1st Dist.] July 2, 2020, pet. denied) (mem. op.) (concluding that "parental abilities" and "programs available" factors weighed in favor of termination where parents had completed "some, but not all, of" their required services and potential adoptive parents were able to meet child's needs); *In re J.O.*, No. 11-19-00088-CV, 2019 WL 3822198, at *2–3 (Tex. App.—Eastland Aug. 15, 2019, no pet.) (mem. op.) (holding evidence sufficient

complete a service plan that has been made an order of the trial court is a conduct-specific ground for termination that, like all other conduct grounds, is a separate, independent ground for termination from the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O), (2). A failure of proof on one therefore does not render the evidence insufficient to support an affirmative finding of the other.

to support finding that termination was in child's best interest where record reflected that all of child's needs were being met by foster parents, who wanted to adopt, and that foster parents "would be able to meet any medical needs that might arise in the future").

### f. Plans for Penny

Mother and Father had difficulty articulating their future plans for Penny. Mother testified that she was "going to . . . take care of [her] kids; do what [she is] supposed to do[; n]ever, ever go through this ever again[; k]eep moving forward[; and r]each more of [her] goals that [she] want[ed] to accomplish in life." Those goals included "mak[ing] sure that [her] kids stay in school" and "to continue to move forward with [her] family and [for them] to be in peace." Father testified:

> My future plan for [Penny] -- it's my seed. The same thing I did for the rest of my children, I want her to do everything that she wants to do, but my plan is for her to be with her daddy where she belongs. I had her. That's my baby. I mean, what other plans would I have for [Penny]?
>
> . . . .
>
> [I dream for her to be] home with her father and her siblings where she's supposed to be. Her -- my dream is for her to do the best that she can in whatever she wants to do. . . .
>
> . . . .
>
> . . . She can -- she can [continue in gymnastics]. I mean, but she is a baby. Someone has placed her there . . . , but she didn't put herself there. So whatever she wants to do. This will be as we grow as a family, she will -- with me asking her or her, being as bright as she is, she will let me know what she wants to do.

The Department's plan for Penny was adoption by R.B. and A.B. if the trial court terminated parental rights. Crosson testified that R.B. and A.B. want Penny to continue with the gymnastic classes and a mommy and me daycare that she was in, "and then eventually she'll be in private school." Crosson added, "They want [Penny] to have normalcy, just a stable, secure life." A.B. confirmed that they would like to adopt Penny "if termination is awarded." She explained that she and R.B. were seeking to adopt Penny so that she can have that permanent and stable life. "Stability and permanence are paramount in the upbringing of children." *M.E.-M.N.*, 342 S.W.3d at 263. This factor favors termination.

### g. Stability of the Home/Proposed Placement

Under the Texas Family Code, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tex. Fam. Code Ann. § 263.307(a). At the time of trial, Penny "ha[d] been placed in a stable home, and the plan [wa]s for her to be adopted into that family." *See In re V.S.*, No. 02-22-00063-CV, 2022 WL 2252775, at *6 (Tex. App.—Fort Worth June 23, 2022, pet. denied) (mem. op.). Evidence about placement plans and adoption is relevant to the child's best interest. *In re J.A.B.*, No. 2-06-404-CV, 2007 WL 3037720, at *6 n.40 (Tex. App.—Fort Worth Oct. 18, 2007, no pet.) (mem. op.). The testimony of Crosson and A.B. established that Penny "interacts well with her placement family and that her needs . . . are amply met." *See V.S.*, 2022 WL 2252775, at *6. In contrast, Father and Mother both used drugs; neither had steady employment or

33

income during the pendency of the termination suit; and when asked if she had had housing this entire case, Mother testified, "No." *See J.A.B.*, 2007 WL 3037720, at *6 (holding that trial court could have concluded that parent would not provide a stable home because of her drug use and the caseworker's testimony that she did not have a steady home or job). This factor weighs in favor of termination.

### h. Acts or Omissions Indicating that the Parent–Child Relationships Were Not Proper

Mother abused drugs while pregnant with Penny, and both had drugs in their systems at Penny's birth. Father initially tested negative on all his drug tests and was therefore given the opportunity to take possession of Penny, but he refused because he would have had to make Mother move out.[17] He even said, "I guess foster care would probably [be] the best place for [Penny] right now." Mother and Father each repeatedly tested positive for illegal drugs during the pendency of the termination suit, and both denied they were using drugs. Their illegal drug usage exposed them to the possibility of incarceration, especially Father, who was on parole. In addition, their reported income was not nearly enough to cover their known expenses, and when Crosson inquired "where the extra money [wa]s coming from," Mother's explanation was "that they're just really good with budgeting their money." These acts and

---

[17]Father testified at trial that the Department had told him that he could have Penny if he "tested and came back negative" but that it wanted someone to move into his apartment with him to supervise him, and he did not want to do that.

omissions indicated that neither parent's relationship with Penny was a proper one. This factor weighs in favor of termination.

### i. Excuses

The record contains little in the way of excuses for Mother's or Father's acts and omissions. Mother testified that she used cocaine several times a week during her pregnancy with Penny "when [she] was upset and, you know, going through things" and that at the time, she did not feel like she "was ready, you know, to bring a little child into this world, but [she had] learned from it." She testified that she was taking Xanax for depression and hydrocodone for pain from her delivery of Penny. She could not explain all her positive drug test results. She claimed to be "clean" at trial, but she could not recall the last time she had taken hydrocodone. Both Mother and Father admitted in their trial testimony to smoking or otherwise using marijuana in the past, and both denied ever using methamphetamine. Mother testified that she had stopped using cocaine in December 2022, and Father testified that he had never used cocaine.

As to the discrepancy between their income and expenses, Mother testified that between August 2023 and January 2024 she had received $900 a week in unemployment that she had never told Crosson about. She also testified that she was employed "off and on . . . doing temporary jobs" from December 2022 through August 2023 but that she did not provide Crosson proof of employment for that time. Father equivocated on whether he had reported all his income to Crosson. He said,

35

"I don't talk to the caseworker. She only send me to test. But yeah, I let her know" about the T-shirt business, "but it seems some things are not brought forth."[18] The trial court was entitled to find that this factor weighed in favor of termination.

### 3. Holdings

Viewing the evidence in the light most favorable to the trial court's best-interest findings, we hold that a reasonable factfinder could have reasonably formed a firm conviction or belief that termination of the parent–child relationship between Father and Penny was in Penny's best interest, and we therefore hold that the evidence is legally sufficient to support the trial court's best-interest finding as to Father. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *J.P.B.*, 180 S.W.3d at 573. Based on our exacting review of the entire record and giving due deference to the factfinder's findings, we likewise conclude that the evidence is factually sufficient to support the trial court's best-interest finding. *See C.H.*, 89 S.W.3d at 18–19. Accordingly, we overrule Father's fourth issue.

Viewing the evidence in the light most favorable to the trial court's best-interest finding, we further hold that a reasonable factfinder could have reasonably formed a firm conviction or belief that termination of the parent–child relationship between Mother and Penny was in Penny's best interest, and we therefore hold that the evidence is legally sufficient to support the trial court's best-interest finding as to

---

[18]Crosson testified that Father had mentioned his T-shirt business to her "at the very beginning of the case" but never provided her any financials on it.

Mother. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *J.P.B.*, 180 S.W.3d at 573. Based on our exacting review of the entire record and giving due deference to the factfinder's findings, we likewise conclude that the evidence is factually sufficient to support the trial court's best-interest finding as to Mother. *See C.H.*, 89 S.W.3d at 18–19. Accordingly, we overrule Mother's one issue.

## IV. CONCLUSION

Having overruled Father's dispositive issues and Mother's only issue, we affirm the trial court's termination order.

/s/ Dana Womack

Dana Womack
Justice

Delivered: September 26, 2024

37